No. 44,003

United States of America, Ft. Riley C-2 Housing, Inc., Ft. Riley C-3 Housing, Inc., Ft. Riley C-4 Housing, Inc., Ft. Riley C-5 Housing, Inc., Ft. Riley C-6 Housing, Inc., Ft. Riley C-7 Housing, Inc., and Ft. Riley C-8 Housing, Inc., *Appellants,* v. The Board of County Commissioners of Riley County, Kansas, Floyd Conwell, Commissioner, Ivan Sand, Commissioner, Joe D. Haines, Commissioner, Muriel E. Beck, Treasurer, Clarence Watson, Sheriff, and Beatrice King, County Clerk, *Appellees.*

(400 P. 2d 685)

Opinion filed April 10, 1965.

*Richard J. Heiman,* of Washington, D. C., argued the cause, and *Louis F. Oberdorfer,* Assistant Attorney General, *Lee A. Jackson, I. Henry Kutz* and *Michael K. Cavanaugh,* of Washington, D. C., *Newell A. George,* United States Attorney, *Elmer Hoge,* Assistant United States Attorney and *Clarence J. Malone,* Assistant United States Attorney, all of Topeka, were with him on the briefs for the appellants.

*Donn J. Everett,* County Attorney, of Manhattan, argued the cause, and was on the briefs for the appellees.

The opinion of the court was delivered by

Hatcher, C.: This is an appeal from a judgment in an action brought by the United States and seven Fort Riley Housing Corporations to enjoin the collection and assessment of a personal property tax levied against such corporations by Riley County, Kansas. The corporations were formed at the direction of the Secretary of Defense pursuant to the terms of the Capehart Act.

The Capehart Act provides a means of financing the construction of housing facilities for military and civilian personnel through the medium of government guaranteed loans. Its salient features are government operation and ownership of military housing through the use of private financing as opposed to current appropriations.

The procedure for procuring the financing and construction of

the Capehart housing, insofar as here material, may be summarized. The Secretary of Defense, after determining a need for military housing at Fort Riley, Kansas, issued an invitation for bids. The contractor submitting the lowest acceptable bid received a letter of acceptability from the secretary. The letter, in part, required the successful bidders to establish private "mortgagor-builder" corporations under the law of Delaware with paid in capital stock of $1,000, qualified to do business in the State of Kansas, where the housing was to be built; to arrange for a private lender acceptable to the Federal Housing Commissioner to finance loans under terms outlined by the letter of acceptability; to cause the mortgagor-builders and the mortgagee-lender to enter the building loan agreements, the form for which was supplied by the United States; to cause the mortgagee-lender to apply for mortgage insurance and take the necessary steps to cause the Federal Housing Commissioner to issue a commitment for insurance to provide insurance during and after construction; to cause the mortgagor-builders to execute leases, the form for which was supplied by the United States, to the United States; to be prepared, at the closing, to execute a performance and payment bond and to enter at that time all documents, including the housing contract, required to be executed by the contractor; and to cause the mortgagor-builders and the mortgagee-lender at the time of closing to execute all the documents required to be executed by them at that time. The documents and contracts required to be executed by the letter of acceptability and the housing contract at the closing were executed in the form prescribed for each of them by the United States.

The mortgagor-builder corporations were each capitalized at $1,000. Pursuant to the letter of acceptability, the contractor purchased the stock of these corporations, elected for each a board of directors and appointed their officers. The stock of the corporations, together with the resignations of their officers and directors, were, in accordance with the terms of the housing contract, placed in escrow with the mortgagee-lender at the time of the delivery of the housing contract. The escrow agreement provided that the stock and the resignations of the officers and directors are to be delivered to the United States either on completion and acceptance of the project, upon termination of the project by the United States at its convenience, upon default of the mortgagor-builder corporations or the contractors, or upon the completion date set forth in

the simultaneously executed building loan agreement if none of the other listed events have occurred at that time. The escrow agreement makes no provision for redelivery of the stock and resignations back to the contractor, and the mortgagee-lender, as the depository, is given no discretion, but is required only to make delivery to the United States upon the happening of any of the above-mentioned conditions.

The $1,000 required by the letter of acceptability to be paid by the contractor for the stock of a mortgagor-builder corporation is, in turn, paid over by these corporations to the United States in consideration of the execution of a 55-year lease of government land upon which the military housing is to be built. Under the terms of the lease it is provided, in part, that the leased premises are "to be used solely for the purpose of constructing thereon an Armed Services Housing Project. . . ," "That the Lessee shall place each housing unit in the Project under the control of the Department . . .," and "That the buildings, fixtures, and other improvements comprising the Project, including all items required to be furnished as a part of the Project in accordance with the Drawing and Specifications shall be and become real estate and part of the leased premises and property of the United States. . . ." The mortgagor-builder corporations are given no title or right of occupancy of the improvements, but only the use of the premises for the construction of the improvements—a task which is done solely by the constructors.

This leasehold was then mortgaged, the mortgagee-lender agreeing to lend an amount sufficient to finance the construction of the desired improvement which loan was insured by the Federal Housing Commissioner during and after construction of the improvement. While the mortgagor-builder corporation signed the note as primary debtor it was never contemplated that the advance by the mortgagee-lender will be repaid by the mortgagor-builders, for the United States undertakes to repay the note upon completion of the project for its termnation by the United States at its convenience, and the mortgagor-builder was entirely without funds or income.

The bonded contract entered by the United States, the mortgagor-builder and the contractor provided for the construction of the project under governmental supervision and for progress payments to be advanced as needed only on the request of the contractor and the approval of the United States. In addition to the provision in

the lease, mentioned above, providing that the improvements are real estate and the property of the United States, it is stated in the contract that "'title to all material and work for which progress payments have been made shall, on such payment vest in the Department. . . .'"

While the mortgagor-builders, pursuant to the building loan agreement, are to receive the advances from the mortgagee-lender, they have a corresponding duty to "pass on to the eligible builder undiminished and without delay any and all advancements received from mortgage proceeds under the Building Loan Agreement. . . ." None of the mortgagor-builder corporations has engaged in, suffered or performed any act or conduct other than that prescribed by the housing contract and related documents.

The statute authorizes the Secretary of Defense to redeem the mortgages by the use of current rental and quarters allowances payable to military personnel and that the mortgagor-builder corporations will be dissolved upon redemption of the mortgages.

On January 1, 1962, no part of any of the improvements then in existence had been determined to be available for occupancy and no part of any improvements was occupied for dwelling purposes.

Riley County through its authorized officers has levied personal property taxes under K. S. A. 27-102b *et seq.*, for the improvements existing on January 1, 1962, against the mortgagor-builder corporations.

The lower court found that the mortgagor-builder corporations were private corporations and the owners of the uncompleted improvements, which were found to be "housing projects" and held that the Kansas statute was applicable and that its application was not in violation of the Federal Constitution.

The plaintiffs have appealed.

The appellants contend that the property in question was exempt from taxation under that part of G. S. 1949, 79-201 which exempts "All property belonging exclusively to this state or to the United States. . . ."

The appellees contend that the taxes were properly levied under the provisions of K. S. A. 27-102b which reads:

"The property of any private corporation engaged in the business of owning or operating housing projects upon United States military reservations in this state shall be assessed and taxed annually, and the county in which the housing project lies geographically as determined by the descriptions set out in chapter

18 of the General Statutes of 1949 shall have jurisdiction over such housing projects for the purposes of taxation."

and the provisions of K. S. A. 27-102c which states:

"For the purposes of valuation and taxation, all buildings, fixtures and improvements of such housing projects on such military reservations are hereby declared to be personal property and shall be assessed and taxed as such, and the taxes imposed on such buildings, fixtures and improvements shall be collected by levy and sale of the interest of such owner, in the same manner as provided in other cases for the collection of taxes on personal property."

The limited question for determination would appear to be whether under the terms of the above quoted statutes, were the mortgagor-builder corporations "private corporations" and were they "engaged in the business of owning and operating housing projects?"

We were forced to conclude that they were not. The mortgagor-builder corporations were created to function solely for governmental purposes serving no purpose independent of those of the United States, and being beneficially owned by the United States, they were instrumentalities of the government.

At most the mortgagor-builder corporations held only naked legal title to the improvements. They could never operate the improvements as a housing project nor could they receive any income therefore or benefit in any way.

The mortgagor-builder corporations, while formed by the contractors, were formed at the direction of the United States and were tailored by it to serve merely as vehicles to aid in the procurement of the financing for the desired housing. These corporations served no purpose of the contractor or the mortgagee-lender, but were created only to facilitate the financing of the housing through the medium of government guaranteed loans without utilizing current appropriations. While the mortgagor-builder corporations signed the notes as primary debtors, the funds used to pay the contractor were obviously advanced by the lending institutions on the strength of the government's credit and not on the credit of the corporations themselves, which had neither assets nor the prospect of obtaining assets. The funds advanced are, pursuant to the contract, to be repaid to the lender by the United States and it is never contemplated that they will be repaid by the corporations. A review of the specific function of these corporations in the Capehart Housing scheme reveals that they are merely conduits through which the United States, by effectively committing its credit, has

obtained the use of private funds and avoided a direct appropriation.

The corporations organized at the government's insistence and according to government prescribed forms are almost empty shells. As has been stated, the original paid-in capital of $1,000 is paid over to the government prior to construction in exchange for a 55-year leasehold under which the lessee has no right of use or possession. This is their only asset pursuant to the housing contract and related documents, and they are expressly prohibited from acquiring any other. They are also prohibited from incurring any other liabilities beyond those relative to the housing contract and related documents and these are assumed or guaranteed by the United States or the contractor.

The mortgagor-builder corporations, being mere instrumentalities of the United States Government, partake of the same tax immunity as the United States under the provisions of K. S. A. 79-210 *Fifth*.

The judgment is reversed with instructions to grant relief as prayed for in the petition.

APPROVED BY THE COURT.